**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA**

**FILED**

TIMOTHY O'GRADY, Derivatively On Behalf Of The LandAmerica Financial Group, Inc. Savings and Stock Ownership Plan,

Plaintiff,

vs.

THEODORE L. CHANDLER, JANET A. ALPERT, GALE K. CARUSO, MICHAEL DINKINS, CHARLES H. FOSTER, JR., JOHN P. MCCANN, DIANNE M. NEAL, ROBERT F. NORFLEET, JR., ROBERT T. SKUNDA, JULIOUS P. SMITH, JR., THOMAS G. SNEAD, JR., EUGENE P. TRANI, MARSHALL B. WISHNACK, ROSS W. DORNEMAN, G. WILLIAM EVANS, EMPLOYEE BENEFITS COMMITTEE OF LANDAMERICA FINANCIAL GROUP, INC., and JOHN DOES 1-20,

Defendants.

Civil Action:   2014 MAR 20  P 12: 00

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

3:14 CV 199

HZH

**JURY DEMANDED**

## COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND VIOLATION OF ERISA DISCLOSURE REQUIREMENTS

Plaintiff Timothy O'Grady brings this action on behalf of the LandAmerica Financial Group Employee Savings and Stock Ownership Plan (the "Plan"), covering substantially all employees of LandAmerica Group, Inc., and its subsidiaries (collectively "LandAmerica," "LFG" or the "Company") and alleges as follows:

## INTRODUCTION

1.      Plaintiff brings this action derivatively pursuant to § 502(a)(2) and (3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(2) and (3).

2.      In the alternative, Plaintiff also brings this action as a class action in the event that class action procedures are deemed necessary by the Court, pursuant to Fed. R. Civ. P. 23(a) and

Fed. R. Civ. P. 23(b)(1) and/or (b)(3) of the Federal Rules of Civil Procedure, on behalf of Plaintiff and the following class of persons similarly situated (the "Class"):

> All persons who were participants or beneficiaries of the Plan, whose accounts included investment in LandAmerica common stock in the LandAmerica Financial Group, Inc. Savings and Stock Ownership Plan from February 18, 2008 and July 31, 2009, inclusive (the "Relevant Period") and were damaged thereby. Excluded from the Class are Defendants and members of the Defendants' immediate families, any entity in which a Defendant has a controlling interest, and their heirs, successors-in-interest, or assigns (in their capacities as heirs, successors-in-interest and assigns).

3.     From February 18, 2008 through July 31, 2009 (the "Relevant Period"), the Plan acquired and held shares of LandAmerica common stock.

4.     Defendants, each having certain responsibilities regarding the management and investment of Plan's assets, breached their fiduciary duties to the Plan and participants by failing to prudently and loyally manage the Plan's investment in Company stock by, among other things: (i) continuing to acquire and hold shares of Company stock in the Plan when it was imprudent to do so; (ii) failing to provide complete and accurate information to participants regarding the Company's financial condition and the prudence of investing in Company stock; and (iii) maintaining the Plan's pre-existing investment in Company stock when it was no longer a prudent investment for the Plan.

5.     As a result of Defendants' fiduciary breaches, as alleged herein, the Plan suffered substantial losses, resulting in the depletion of millions of dollars of the retirement savings and anticipated retirement income of the Plan's participants. Under ERISA, the breaching fiduciaries are obligated to restore to the Plan the losses resulting from their fiduciary breaches.

6.     Because the information and documents on which Plaintiff's claims are based are, for the most part, solely in Defendants' possession, certain of Plaintiff's allegations are by

necessity upon information and belief. At such time as Plaintiff has had the opportunity to conduct additional discovery, Plaintiff will, to the extent necessary and appropriate, amend the Complaint or, if required, seek leave to amend to add such other additional facts as are discovered that further support each of the following Counts below.

## JURISDICTION AND VENUE

7.     *Subject Matter Jurisdiction.* This is a civil enforcement action for breach of fiduciary duty brought pursuant to 28 U.S.C. § 131 and ERISA § 502(e)(l), 29 U.S.C. § 1132(e)(l).

8.     *Personal Jurisdiction.* ERISA provides for nation-wide service of process, ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). All of Defendants are residents of the United States, and this Court therefore has personal jurisdiction over them. This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(l)(A), because they all would be subject to the jurisdiction of a court of general jurisdiction in this District.

9.     *Venue.* Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and LandAmerica had its principal place of business in this district. Further, many of the Plan's participants are located in or within close proximity to this district.

## PARTIES

### Plaintiff

10.     *Plaintiff Timothy O'Grady* is a former LandAmerica employee and is a participant in the Plan.

**The Company**

11.     *Non-party LandAmerica* was incorporated under the laws of the Commonwealth of Virginia on June 24, 1991.  LandAmerica is a holding company.  Its principal executive offices are located at 5600 Cox Road, Glen Allen, Virginia 23060.  Further, LandAmerica's products and services facilitate the purchase, sale, transfer, and financing of residential and commercial real estate.  The Company provides these products and services to a broad-based customer group including:  residential and commercial property buyers and sellers, real estate agents and brokers, developers, attorneys, mortgage brokers and lenders, and title insurance agents.  The Company operates through approximately 700 offices and a network of more than 10,000 active agents, and also conducts business in Mexico, Canada, the Caribbean, Latin America, Europe, and Asia.

12.     On November 26, 2008, the Company filed a voluntary petition for relief under Chapter 11 of the U.S. Bankruptcy Code in the Bankruptcy Court of the Eastern District of Virginia.  The bankruptcy is ongoing.

13.     If the bankruptcy stay is modified or lifted to permit further prosecution of this action against LandAmerica, Plaintiff will notify the Court and seek to amend this Complaint to add LandAmerica as a defendant in this action in accordance with the Federal Rules of Civil Procedure and this Court's rules.

**Defendants**

      A.     **The Board of Directors**

14.     *Defendant Theodore L. Chandler* ("Chandler") served as Chairman, Chief Executive Officer and Director of LandAmerica during the Relevant Period.  Further, Defendant Chandler served as Chair of the Company's Executive Committee during the Relevant Period.

During the Relevant Period, Defendant Chandler was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

15.     **Defendant Janet A. Alpert** ("Alpert") served as a director of LandAmerica during the Relevant Period. Further, Defendant Alpert served as a member of LandAmerica's Investment Funds Committee during the Relevant Period. During the Relevant Period, Defendant Alpert was a fiduciary within the meaning of ERISA, because she exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, she possessed discretionary authority or discretionary responsibility in the administration of the Plan, and she exercised authority or control with respect to the management of the Plan's assets.

16.     **Defendant Gale K. Caruso** ("Caruso") served as a director of LandAmerica during the Relevant Period. Further Defendant Caruso served as a member of LandAmerica's Investment Funds Committee and held the title of Vice Chairman during the Relevant Period. During the Relevant Period, Defendant Caruso was a fiduciary within the meaning of ERISA, because she exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, she possessed discretionary authority or discretionary responsibility in the administration of the Plan, and she exercised authority or control with respect to the management of the Plan's assets.

17.     **Defendant Michael Dinkins** ("Dinkins") served as a director of LandAmerica during the Relevant Period. Further, Defendant Dinkins served as a member of both

LandAmerica's Investment Funds Committee and Executive Committee during the Relevant Period. During the Relevant Period, Defendant Dinkins was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

18.     ***Defendant Charles H. Foster, Jr.*** ("Foster") served as a director of LandAmerica during the Relevant Period. Further, Defendant Foster served as a member of LandAmerica's Investment Funds Committee during the Relevant Period.   During the Relevant Period, Defendant Forester was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

19.     ***Defendant John P. McCann*** ("McCann") served as a director of LandAmercia during the Relevant Period. Further, Defendant McCann served as a member of LandAmerica's Executive Compensation Committee and Executive Committee and as Chairman of its Investment Funds Committee during the Relevant Period.   During the Relevant Period, Defendant McCann was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

20.     **Defendant Dianne M. Neal** ("Neal") served as a director of LandAmerica during the Relevant Period. Further, Defendant Neal served as a member of LandAmerica's Executive Compensation Committee during the Relevant Period. During the Relevant Period, Defendant Neal was a fiduciary within the meaning of ERISA, because she exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, she possessed discretionary authority or discretionary responsibility in the administration of the Plan, and she exercised authority or control with respect to the management of the Plan's assets.

21.     **Defendant Robert F. Norfleet, Jr.** ("Norfleet") served as a director of LandAmerica during the Relevant Period. During the Relevant Period, Defendant Norfleet was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

22.     **Defendant Robert T. Skunda** ("Skunda") served as a director of LandAmerica during the Relevant Period. During the Relevant Period, Defendant Skunda was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

23.     **Defendant Julious P. Smith, Jr.** ("Smith") served as a director of LandAmerica

during the Relevant Period. Further, Defendant Smith served as a member of LandAmerica's Investment Funds Committee during the Relevant Period. During the Relevant Period, Defendant Smith was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

24.     *Defendant Thomas G. Snead, Jr.* ("Snead") served as a director of LandAmerica during the Relevant Period. Further, Defendant Snead served as a member of LandAmerica's Executive Compensation Committee and Executive Committee during the Relevant Period. During the Relevant Period, Defendant Snead was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

25.     *Defendant Eugene P. Trani* ("Trani") served as a director of LandAmerica during the Relevant Period. Further, Defendant Trani served as a member of LandAmerica's Executive Compensation Committee and Executive Committee during the Relevant Period. Further, Defendant Trani served as a member of LandAmerica's Executive Compensation Committee and Executive Committee during the Relevant Period. During the Relevant Period, Defendant Trani was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority

or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

26.     *Defendant Marshall B. Wishnack* ("Wishnack") served as a director of LandAmerica during the Relevant Period. Further, Defendant Wishnack served as Chair of LandAmerica's Executive Compensation Committee and as a member of the Company's Executive Committee during the Relevant Period.   During the Relevant Period, Defendant Wishnack was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

27.     Defendants Chandler, Alpert, Caruso, Dinkins, Foster, McCann, Neal, Norfleet, Skunda, Smith, Snead, Trani, and Wishnack are herein referred to as the "Director Defendants."

**B.**     **Defendant Employee Benefits Committee of LandAmerica Financial Group, Inc.**

28.     *Defendant the Employee Benefits Committee of LandAmerica Financial Group, Inc.* ("Benefits Committee") was appointed by the Director Defendants and charged with general administration of the Plan.   *See* LandAmerica Financial Group, Inc., Annual Report for the Plan Form 11-K, dated June 30, 2009.

29.     *Defendant Ross W. Dorneman* ("Dorneman") served as LandAmerica's Executive Vice President and Chief Administrative Officer during the Relevant Period and previously served as the Company's Executive Vice President-Human Resources.   On or about June 26, 2008, Defendant Dorneman signed the 2007 Form 11-K submission to the Securities and Exchange Commission ("SEC") for the Plan on behalf of LandAmerica, as the Plan

Administrator.  During the Relevant Period, Defendant Dornerman was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

30.     *Defendant G. William Evans* ("Evans") served as Executive Vice-President and Chief Financial Officer of LandAmerica during the Relevant Period.  On or about June 30, 2009, Defendant Evans signed the 2008 Form 11-K submission to the SEC for the Plan on behalf of LandAmerica, as the Plan Administrator.  During the Relevant Period, Defendant Evans was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

31.     The John Doe Defendants include members of the Benefits Committee, the identities of whom are currently unknown to Plaintiff.  Plaintiff reserves the right, once their identities are ascertained, to seek leave to join the members of the Benefits Committee to the instant action, as well as any other officers, directors and employees LandAmerica who were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Relevant Period.

## CLASS ACTION ALLEGATIONS

32.    Plaintiff brings this action derivatively pursuant to § 502(a)(2) and (3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(2) and (3). However, Plaintiff also brings this action as class action (if the Court deems this necessary) on behalf of himself and the following class of persons similarly situated:

> All persons who were participants in or beneficiaries of the Plan at any time between February 18, 2008 and July 31, 2009, inclusive (the "Class Period) and which held LandAmerica stock or units in the LandAmerica Stock Fund, but excluding all named defendants and their heirs or successors in interest.

33.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery.

34.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether Defendants each owed a fiduciary duty to Plaintiff and member of the Class;

(b)    whether Defendants breached their fiduciary duties to Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan's participants and beneficiaries; and

(c)    whether Defendants violated ERISA.

35.    Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and the other members of the Class each sustained a diminution of vested benefits arising out of Defendants' wrongful conduct in violation of federal law as complained of herein.

36.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action, ERISA, and complex civil and commercial litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

37.     Class action status in this ERISA action is warranted under Rule 23(b)(l)(B) because prosecution of separate actions by the members or the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical manner, be dispositive of the interests of the other members of the Class parties to the actions, or substantially impair or impede their ability to protect their interests.

38.     Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecuting separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## THE PLAN

39.     During the Class Period, the Plan was an "employee pension benefit plan" as defined by ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A). Specifically, the Plan was a "defined contribution plan" within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).

40.     The Plan is a legal entity that can sue and be sued. ERISA § 502(6)(1). However, in a breach of fiduciary duty action such as this, the Plan is neither a defendant nor a plaintiff.

Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants and beneficiaries.

41.     The Plan was sponsored by LandAmerica and administered by the Company through the Benefits Committee. *See* 2008 Form 11-K.

42.     The Employee Benefits Committee is appointed by the Board of Directors of the Company.

43.     Merrill Lynch Trust Company (the "Trustee") maintains custody of the Plan's assets and serves as the Trustee of the Plan.

44.     The Plan purchased shares of LandAmerica stock and held it in a trust for allocation to eligible participants' accounts.

45.     Employees of the Company and its participating subsidiaries were generally eligible to participate in the Plan after completing 30 days of employment.

46.     Allocations of Company stock were based on a participant's earnings or account balances, as defined in the Plan document.

47.     On November 26, 2008, the Company filed a voluntary petition for relief under Chapter 11 of the U.S. Bankruptcy Code in the Bankruptcy Court of the Eastern District of Virginia. In light of the Company's financial situation, the Director Defendants elected on May 21, 2009 to terminate the Plan effective July 31, 2009. As prescribed under the provisions of ERISA, participants will become 100% vested in their accounts upon termination of the Plan.

**B.     The Plan Fiduciaries**

48.     *Named Fiduciaries.* ERISA requires every plan to provide for one or more named fiduciaries of the plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A). The person named as the "administrator" in the plan instrument is automatically a named fiduciary,

and in the absence of such a designation, the sponsor is the administrator. ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

49. *De Facto Fiduciaries*. ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under ERISA § 402(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

50. Each of the Defendants was a fiduciary with respect to the Plan and owed fiduciary duties to the Plan and its participants under ERISA in the manner and to the extent set forth in the governing the Plan documents, through their conduct, and under ERISA.

51. As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) to manage and administer the Plan and its investments solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

52. Plaintiff does not allege that each Defendant was a fiduciary with respect to all aspects of the Plan's management and administration. Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or

exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

## FACTUAL BASIS OF THE FIDUCIARY BREACHES

53.     LandAmerica was a holding company that operated through its various regulated and unregulated subsidiaries.  LandAmerica's products and services facilitated the purchase, sale, transfer and financing of residential and commercial real estate.  At its height, LandAmerica was the third largest title insurance underwriter in the United States.  LandAmerica 1031 Exchange Services, Inc. ("LES"), a wholly-owned LandAmerica subsidiary, operated as a "qualified intermediary" under section 1031 of the Internal Revenue Code (as amended, the "Tax Code").  Section 103 of the Tax Code permits a taxpayer to defer all or a portion of the gains from the disposition of business or investment property.  To qualify for this tax treatment, the taxpayer must structure the transaction as an exchange of one property for another of "like kind." LES entered into agreements with its customers to facilitate these 1031 "like kind" exchanges ("Exchange Agreements").

54.     Under the Exchange Agreements, and in order to qualify for 1031 tax  treatment, the proceeds of the LES customer's sale of property would be  transferred to LES, which was to maintain possession and control over such funds until such time that  the taxpayer has identified a "like kind" replacement property (the "Replacement Property").   In addition to receiving favorable tax treatment, the fundamental premise of these transactions was that LES would have at the ready (at the appropriate time) sufficient funds to consummate the customer's purchase of the Replacement Property.

55.     Since the inception of LES in the early 1990's, LES's general practice was to commingle the proceeds of one customer's sale of property with funds received in connection

with the 1031 transactions of other customers.   This practice worked as long as LES had sufficient funds available when needed to complete all 1031 transactions.   The failure to complete such a transaction would cause severe damage to LES.

56.   In February 2008, market disruptions brought with them the ominous prospect that the day might soon come when LES would be unable to fulfill all of its exchange obligations.   And yet, for at least seven months thereafter, the directors and officers of LandAmerica and LES remained ostrich-like, with their heads buried in the sand, as the crisis worsened through neglect and unexamined missteps.

57.   Since 2002, LES had invested a substantial portion of the 1031 proceeds it received from 1031 exchangers in auction rate securities ("ARS").   An ARS is a debt instrument with a long-term nominal maturity for which the interest rate is regularly set through an auction process whereby an auctioneer begins with a high asking rate, which is lowered until some participant is willing to accept the auctioneer's rate, or a predetermined reserve rate is reached (a "Dutch Auction").   During the week of February 11, 2008, the market for ARS froze, meaning that there was not enough demand to sell the securities that holders of ARS desired to sell (the "ARS Freeze"), which rendered the ARS LES owned illiquid, meaning that LES could not access the securities to meet its 1031 exchange obligations.

58.   The ARS Freeze was publicized nationally and in attention-grabbing terms.  For example, *The Wall Street Journal* reported on February 12, 2008, that the market for ARS, "another seemingly safe corner of the credit markets, was succumbing to the credit crunch."  The article further stated that ARS had been shunned by investors as auctions were left to "fail," and that during the preceding five days, ARS were unable to garner investors' interest, "leaving roughly $3 billion of such securities in a sort of limbo" in the hands of investors who "might

have intended to get rid of them." *See* Liz Rappaport and Karen Richardson, <u>Student-Loan Issues Under Stress</u>, *Wall St. J.*, Feb. 12, 2008.

59.    *The Wall Street Journal* reported on the ARS Freeze again the next day. *See* Liz Rappaport and Randall Smith, <u>Credit Woes Hit Funding For Loans To Students</u>, *Wall St. J.*, Feb. 13, 2008.

60.    Mr. Ronald Ramos ("Ramos"), Vice President and Treasurer of LandAmerica, testified that he discovered that the auction rate securities became illiquid "around February 11th of 2008." *See* February 18, 2009 deposition transcript of Ronald Ramos at p. 18.

61.    As a result of the ARS Freeze, LES was unable to liquidate its ARS at any price near their par value, which caused a significant LES liquidity problem that posed serious risks to both LES and LandAmerica (the "LES Liquidity Crisis").

62.    The significance of the liquidity problem is highlighted by the fact that Mr. Ramos instructed Devon M. Jones, Assistant Treasurer of LandAmerica, to prepare weekly liquidity report "shortly after February of 2008" due to the "illiquidity of the auction rate securities." *See* February 11, 2009 deposition transcript of Devon M. Jones at p. 137.

63.    As of March 31, 2008, out of a total LES commingled portfolio of approximately $612 million, approximately $290.5 million was invested in illiquid ARS.   Ultimately, the illiquidity of the ARS resulted in LES's inability to meet Exchanger obligations and was the cause of LES's bankruptcy and at a minimum a significant contributing factor to the Chapter 11 filing by LandAmerica.

64.    From February 2008 forward, the extent to which and for how long LES could continue to meet its obligations to 1031, customers became a critical issue.

65.    Despite this, LES continued to take in new customer funds with no change in

operations or in any of its disclosures to its customers. Because of the inter-dependency of LandAmerica and LES, this situation, if not addressed promptly and effectively, was a crisis in the making for all of LandAmerica.

66.     For at least seven months after the ARS market seized up, the LandAmerica Board of Directors and its officers (including Defendants Dorneman and Evans) failed to become adequately informed about the extent of the crisis and failed to consider or take any timely action to avoid or mitigate the resulting damage to the Plan.

67.     Yet the gravity of the situation for LandAmerica was, or should have been, obvious. LandAmerica and LES depended for their survival on business relationships and a reputation for reliability. LES's default on its 1031 obligations (if it came after months of taking in new customer funds following the ARS Freeze) would inflict a fatal wound on the LandAmerica brand as a whole. Yet the directors and officers of LandAmerica blindly allowed new customer funds to continue to be taken in, without review of readily available information or deliberation.

68.     If Defendants had timely and adequately informed themselves about this crisis, it would have been plain that simply allowing LES to conduct business as usual after February 2008 posed too great a risk to LandAmerica and in turn to the Plan.

69.     When Defendants finally awoke from their slumber, the alternatives available to address the crisis had severely diminished or were lost entirely. LES had taken in new customer money for more than seven months after the ARS market froze, so it was far too late as a matter of public and customer relations to lay that crisis at the feet of a dysfunctional market or the institutions that sold LES the ARS. Through inaction, Defendants had placed LandAmerica in a "bet the company" situation. And bet the company they did; in direct violation of corporate

guidelines and breaching their duty of care, Defendants caused $65 million to be transferred from LandAmerica to LES in an attempt to put out the fires at LES that had been allowed to smolder for so long. To that same end, approximately $70 million of liquid securities were transferred from LandAmerica's title insurance subsidiaries, the life-blood of the LandAmerica enterprise, to LES in exchange for approximately $88 million face value of wholly illiquid ARS.

70.    Ultimately, LES's liquidity crisis was a substantial cause of LandAmerica's downfall, a downfall that included a failed merger, a bankruptcy filing, the sale of LandAmerica's primary title insurance businesses at a distressed price, scores of lawsuits and multiple government investigations. While most other leading title insurance companies survived the real estate downturn, LandAmerica did not. LandAmerica met its demise because Defendants failed to properly inform themselves and failed to consider and implement any timely action to mitigate the effects of the LES liquidity crisis. These failures caused the Plan to incur millions of dollars in damages.

71.    During the course of its operations, LES entered into Exchange Agreements with its customers ("Exchangers") whereby LES would acquire the net proceeds of the sales of a Relinquished Property (the "Exchange Funds") in accordance with requirements of the Tax Code in order to facilitate a like-kind exchange. Pursuant to the Exchange Agreements, LES took sole and exclusive possession, dominion, control and use of all Exchange Funds, including interest, if any, earned on the Exchange Funds until the earlier of the consummation of a like-kind exchange or such other date or event as provided in the Exchange Agreements.

72.    In connection with its business as a qualified intermediary for like-kind exchanges, LES maintained a general, multipurpose checking account at SunTrust since 1992. This checking account was titled in LES's own name, bearing an account number with the last

four digits "3318" (the "Operating Account"). LES used the Operating Account as its general operating account.

73.      The Operating Account received cash from various sources including in the form of (i) Exchangers' exchange funds, (ii) service fees charged to Exchangers, (iii) interest, and (iv) returns on LES's investments. LES disbursed funds from the Operating Account to pay its expenses, to pay dividends to LandAmerica, to make investments in other investment vehicles, and to purchase replacement property for Exchangers who had not insisted that their exchange funds be deposited in segregated accounts.

74.      To maximize its revenue LES used funds in the Operating Account to invest in a variety of short-term investments, including money market mutual funds, short-term bonds, certificates of deposit, floating rate notes, and ARS. The ARS were held in brokerage investment accounts at SmithBarney and SunTrust Robinson Humphrey.

75.      After the ARS Freeze in February 2008, LES continued to accept new money from Exchangers, which money was commingled with other Exchange Funds and used to meet existing 1031 Exchange obligations. Moreover, after the ARS Freeze, and until late November 2008, not one of the following actions was taken: (i) revising disclosures in marketing material to Exchangers in light of the ARS Freeze; (ii) segregating all new Exchange Funds; (iii) revising scripts for LES employees in the field working with Exchangers; (iv) increasing oversight and control of LES personnel who interacted with customers; (v) commencing legal action against the financial institutions that sold the ARS to LES and/or otherwise monetizing the ARS; (vi) closing LES; and/or (vii) filing LES for bankruptcy. In short, LES conducted business as usual.

76.      At no time, did Defendants so much as consider whether LES should make any changes in the way it did business, in view of the fact that close to half of its commingled assets

were no longer accessible for purposes of meeting its 1031 Exchange obligations to Exchangers. Instead, LES continued business as usual and had for several months taken in hundreds of millions of dollars of new Exchange Funds and used such funds to meet obligations to earlier Exchangers. In effect, it operated a Ponzi scheme.

77.     From February 2008 on, the percentage of LES's commingled balance that was made up of ARS dramatically increased because the balance in the Operating Account steadily declined while approximately $290.5 million of Exchange Funds remained invested in illiquid ARS. The net outflows meant that LES's practice of using newly acquired Exchange Funds to meet existing 1031 Exchange obligations was doomed. And when the end came, the fallout would be catastrophic. Nevertheless, Defendants failed to timely inform themselves as to whether LES's practice of business as usual and simply using newly acquired Exchange Funds to pay out on existing obligations was likely to fail, as it ultimately did, what the consequences of that failure would have been for LandAmerica, or what actions should have been taken to avoid or mitigate the impending.

78.     On February 18, 2008, LandAmerica's Investment Funds Committee (the "Committee") met. The Investment Funds Committee was charged with monitoring the investments of LandAmerica and its subsidiaries. According to the Committee's charter, this responsibility included the duty to review the "alignment of asset duration to liabilities." Though the ARS market froze the prior week, the Investment Funds Committee did not address the LES Liquidity Crisis at its February 18 meeting.

79.     On February 19, 2008, the LandAmerica Board of Directors met. The Director Defendants, including but not limited to, Defendant Evans, were aware of the ARS Freeze as of this date. At this meeting, the Director Defendants were briefed on corporate risks, and there

- 21 -

was discussion of the Risk Committee and the "Risk Dashboard" (as discussed in more detail below). In connection with this briefing, the Director Defendants received a written presentation entitled "Strategic Risk Discussion," which, among other things, included a "Risk Dashboard" and a document entitled "Top 10 Corporate Risks." There was no discussion of the LES Liquidity Crisis.

80.     The Risk Committee was scheduled to meet on February 25, 2008.

81.     The meeting was canceled because no risks were identified or considered for discussion at that time. The primary objective of the Risk Committee, as ultimately set forth in writing in the Risk Committee charter, was to identify various risks including "operational, legal, regulatory, market and reputation" that threaten the achievement of LandAmerica's objectives. Specifically, the Risk Committee members were charged with the duty and responsibility, among other things, to "review and recommend action on significant risk issues, trends and practices that have enterprise-wide implications." In connection with these duties, the Risk Committee created a so-called "Risk Dashboard" to identify and track potential risks to LandAmerica and responses to said risks.

82.     The Risk Committee reported to the Audit Committee, and the Board of Directors had ultimate oversight responsibility with respect to the management of LandAmerica risks. The "Risk Dashboard" was to be reviewed by the Audit Committee on a quarterly basis. The Risk Committee was scheduled to meet monthly throughout 2008. Notwithstanding the LES Liquidity Crisis that emerged two weeks prior, the LandAmerica Risk Committee adjourned until its next regularly-scheduled meeting in March.

83.     The LandAmerica Board of Directors did not meet in March 2008. On March 25, 2008, Stephen Connor, a member of LES's Board of Directors and a Senior Vice President of

LES and LandAmerica who was responsible for the daily business functions of LES, wrote to his regional managers:

> We are just about to the end of the 1st quarter of 2008 and things are very bleak for LandAmerica Exchange Services [LES] . . . [a]s you can plainly see our business volume is off by almost 50% same period year over year. This is a trend that is not going to change anytime soon.

84.     On March 26, 2008, the Risk Committee met. There was no discussion of the LES Liquidity Crisis.

85.     On April 21, 2008, the Risk Committee met. There was no discussion about the LES Liquidity Crisis.

86.     The Investment Funds Committee met on April 28, 2008. At that meeting Mr. Ramos, Treasurer of LandAmerica and LES, made a presentation regarding LES's ARS investment. The Investment Funds Committee requested that Mr. Ramos provide a "contingency plan that outlines the options available to allow the company to obtain liquidity related to these securities." No such "contingency plan" was submitted to the Investment Funds Committee until, at the earliest, October 1, 2008 and the Investment Funds Committee did not request that such a plan be delivered to it any sooner. In the meantime, the LES Liquidity Crisis persisted, LES continued to use new Exchange Funds to meet existing 1031 Exchange obligations, and the net outflow of LES funds continued.

87.     As of the April 28 Investment Funds Committee meeting, the LES commingled balance had experienced a substantial and continuous decline. On information and belief, members of the Investment Funds Committee were aware of, or had sufficient information to make inquiries about, the foregoing.

88.     On April 28, 2008, the Audit Committee met. The Audit Committee reviewed the

minutes from the April 21, 2008 Risk Committee meeting. There was no discussion of the LES

Liquidity Crisis. There was no suggestion that the LES Liquidity Crisis should be included as a

new strategic risk on the Risk Dashboard.

89.     On April 29, 2008 the LandAmerica Board of Directors met. The minutes of that

meeting record only the following with respect to the LES Liquidity Crisis:

> The [Investment Funds] Committee reviewed the 1031 exchange
> portfolio. Out of a portfolio of $612 million, approximately $290
> million is in ARS, which are collateralized by student loans.
> Although these securities are not liquid, presently they do not pose
> a concern because the 1031 portfolio always has a base amount of
> money it is holding. The Board discussed the ARS issue,
> including the impact on the 1031 business and options in case the
> portfolio shrinks to below $300 million. Mr. McCann stated that
> the Committee will continue to monitor these securities.

90.     In connection with this meeting, there were no written presentations regarding

the LES Liquidity Crisis or the LES commingled balance, such as the recent historical trend of

such balances and/or projections.

91.     As of April 29, 2008, at the latest, Defendants: (i) were aware that LES invested

in ARS; (ii) were aware of the ARS Freeze; (iii) were aware that nearly half of LES's portfolio

was illiquid and therefore could not be used to meet 1031 Exchange obligations; (iv) were aware

of, or had sufficient information to make inquiries about, the fact that LES, in a Ponzi fashion,

was relying on the inflow of funds from new 1031 Exchange transactions to fund the completion

of existing 1031 Exchange transactions; (v) and were aware, as reported by Defendant Evans on

April 29, 2008, that the real estate market was in decline, and that there was much uncertainty in

the market which made forecasting difficult.

92.     At this April 29th meeting, the Directors Defendants exercised no independent

judgment and failed to take or consider any timely action with respect to the LES Liquidity

Crisis. Further, the Director Defendants failed to carry out their oversight responsibilities and failed to adequately inform themselves with respect to the LES Liquidity Crisis. Thus, the Director Defendants failed to take measures to inform themselves about the legal and financial risks of LES using new Exchange Funds after the ARS Freeze to meet existing 1031 Exchange obligations; adequately inform themselves as to whether there likely would be sufficient new Exchange Funds to pay out existing obligations in the weeks and months ahead; implement any oversight process for keeping themselves informed on a regular or ongoing basis about LES's liquidity, notwithstanding that one or more directors acknowledged the need for ongoing review of the situation; inform themselves as to whether LES had made, or should make, any changes to its business in light of the LES Liquidity Crisis such as segregating all new Exchange Funds and/or revising marketing materials or other disclosures to Exchangers; request an analysis of the LES Liquidity Crisis and potential solutions to the same, such as potential claims against the financial institutions that sold the ARS to LES; inform themselves about the extent of LandAmerica's legal liability, if any, in connection with LES's 1031 Exchange obligations; inform themselves as to what alternatives were then available to LandAmerica to avoid or mitigate the effect the LES Liquidity Crisis might have on the Plan (and LandAmerica), including but not limited to closing LES and/or filing LES for bankruptcy; and/or seek independent advice with respect to any of these matters, notwithstanding that one or more directors understood the need for obtaining expert advice.

93.     In the meantime, the LES Liquidity Crisis persisted, LES continued its Ponzi-type practice of using new Exchange Funds to meet existing 1031 Exchange obligations and the net outflow of LES funds continued.

94.     On April 29, 2008, LandAmerica filed with the United States Securities and

Exchange Commission (the "SEC") its Form 10-Q for the quarterly period ended March 31, 2008, signed by Defendants Chandler and Evans. This fiduciary communication stated, among other things:

> As a result of liquidity issues in the global credit and capital markets, the auctions for our ARS failed beginning February 2008 when sell orders exceeded buy orders. Our portfolio of ARS is comprised entirely of student loan ARS of which 99.1% is guaranteed by government-sponsored enterprises . . . . We believe the failures of these auctions do not affect the value of the collateral underlying the ARS and we continue to earn and receive interest on our ARS at contractually set rates.
>
> However, we have liquidity exposure to these securities to the extent that we would be required to utilize these securities to satisfy the purchase of properties. Based on the credit quality of the underlying securities and the amount of funds we have historically held, we believe the risk of loss will not have a material adverse effect on our financial position or results of operations.

See LandAmerica Quarterly Report Form 10-Q, dated April 29, 2008 at 18.

95.     On May 13, 2008, the Investment Funds Committee met. The meeting lasted twenty-five minutes. There was no discussion of the LES Liquidity Crisis. Defendant McCann announced at this meeting that he was stepping down as Chairman of the Investment Funds Committee and that he would be replaced by Defendant Caruso.

96.     On May 13, 2008, the LandAmerica Board of Directors met. Defendant Chandler was re-elected as Chairman of the Board. There was no discussion of the LES Liquidity Crisis. Again, the Director Defendants exercised no independent judgment and failed to take or consider any timely action with respect to the LES Liquidity Crisis. Further, the Director Defendants failed to carry out their oversight responsibilities and failed to adequately inform themselves with respect to the LES Liquidity Crisis. Thus, the Director Defendants failed to take measures to inform themselves about the legal and financial and risks of LES using new Exchange Funds

after the ARS Freeze to meet existing 1031 Exchange obligations; adequately inform themselves as to whether there likely would be sufficient new Exchange Funds to pay out existing obligations in the weeks and months ahead; implement any oversight process for keeping themselves informed on a regular or ongoing basis about LES's liquidity, notwithstanding that one or more directors acknowledged the need for ongoing review of the situation; inform themselves as to whether LES had made, or should make, any changes to its business in light of the LES Liquidity Crisis such as segregating all new Exchange Funds and/or revising marketing materials or other disclosures to Exchangers; request an analysis of the LES Liquidity Crisis and potential solutions to the same, such as potential claims against the financial institutions that sold the ARS to LES; inform themselves about the extent of LandAmerica's legal liability, if any, in connection with LES's 1031 Exchange obligations; inform themselves as to what alternatives were then available to LandAmerica to avoid or mitigate the effect the LES Liquidity Crisis might have on the rest of LandAmerica and Plan members, including but not limited to closing LES and/or filing LES for bankruptcy; and/or seek independent advice with respect to any of these matters, notwithstanding that one or more directors understood the need for obtaining expert advice.

97.    In the meantime, the LES Liquidity Crisis persisted, LES continued in a Ponzi fashion to use new Exchange Funds to meet existing 1031 Exchange obligations, and the net outflow of LES funds continued.

98.    The Risk Committee was scheduled to meet on May 22, 2008.  The meeting was canceled because no risks were identified or considered for discussion at that time.

99.    The LandAmerica Board of Directors did not meet in June, 2008.

100.    On June 23, 2008, the Risk Committee met.  There was no discussion of the LES

Liquidity Crisis.

101.    On July 21, 2008, the Risk Committee met.  There was no discussion of the LES Liquidity Crisis.

102.    As of July 25, 2008, the total approximate value of the commingled portfolio was just below $500 million, of which approximately $290 million, or in excess of fifty-eight percent of the total value of the commingled portfolio, was invested in ARS.  Based upon these figures and if the trend of net outflows had continued at its then-current pace, LES would have been unable to meet exchange obligations within approximately two months.

103.    The Investment Funds Committee, the Audit Committee and the full LandAmerica Board of Directors had sufficient information to cause them to make inquiries about the foregoing. Because of their inadequate attention to the matter, the members of the Investment Funds Committee, Audit Committee, and the full LandAmerica Board of Directors failed to inform themselves of the foregoing in July 2008.

104.    On July 28, 2008, the Investment Funds Committee met.  The meeting lasted one hour and forty-five minutes.  Among other items, the minutes of the meeting memorialized the fact that the Committee requested Management present an update of the LandAmerica 1031 Exchange Services Inc.'s portfolio holdings and corresponding ratings, liquidity issues, and funding scenarios at the October meeting.

105.    There was no substantive discussion of the LES Liquidity Crisis at the July 28, 2008 Investment Funds Committee meeting.   Instead, the Investment Funds Committee postponed consideration of the issue until its scheduled October 27, 2008 meeting.

106.    As the Investment Funds Committee could have readily determined as of this meeting, the impact of the LES Liquidity Crisis would not wait for the October 27th meeting.

107.    Ultimately, the Investment Funds Committee had to call a special meeting to take place on October 1, 2008.

108.    The Audit Committee met on July 28, 2008.  There was no discussion of the LES Liquidity Crisis, and there was no suggestion that the LES Liquidity Crisis should be included as a new strategic risk on the Risk Dashboard.

109.    The LandAmerica Board of Directors met on July 29, 2008.  Among other items, the minutes of that meeting memorializes the fact that:

(a)    the Investment Funds Committee discussed the ARS in the Company's 1031 exchange services portfolio;

(b)    Defendant Caruso noted that the ARS have stayed illiquid longer than anyone expected;

(c)    At its October 2008 meeting, the Committee will review the 1031 portfolio to gain an understanding of the timing of commitments, and management will present the Company's options if greater liquidity is needed.

110.    Thus, more than five months after the LES Liquidity Crisis arose, the members of the Investment Funds Committee and the members of the full LandAmerica Board of Directors had yet to gain an understanding of the LES Liquidity Crisis and had still not informed themselves of options to solve or mitigate the LES Liquidity Crisis.  Not only that, the LandAmerica Board of Directors was content to delay the issue for another three months, to October 28, 2008.

111.    Consistent with its prior practice, at the July 29, 2008 meeting, the Director Defendants exercised no independent judgment and failed to take or consider any timely action with respect to the LES Liquidity Crisis.  Further, the Director Defendants failed to carry out

their oversight responsibilities and failed to adequately inform themselves with respect to the LES Liquidity Crisis. Thus, the Director Defendants failed to take measures to inform themselves about the legal and financial risks of LES using new Exchange Funds to meet existing 1031 Exchange obligations; inform themselves as to whether LES had made, or should make, any changes to its business in light of the LES Liquidity Crisis, such as segregating all new Exchange Funds and/or revising marketing materials or other disclosures to Exchangers; seek to inform themselves as to whether there would likely be sufficient new Exchange Funds to pay out existing LES obligations through October 28, when the Director Defendants were scheduled to meet again; implement any oversight process for keeping themselves informed on a regular or ongoing basis about LES's liquidity; inform themselves about the extent of LandAmerica's legal liability, if any, in connection with LES's exchange obligations; and/or inform themselves as to what alternatives were then available to LandAmerica to avoid or mitigate the effect of the LES Liquidity Crisis on the Plan.

112.   They put off an analysis of the LES Liquidity Crisis and potential solutions to same until late October. And, yet again, the Director Defendants did not seek independent advice as to any of these matters.

113.   Likewise, all Defendants failed to adequately inform themselves about the foregoing matters as of July 2008.

114.   In the meantime, the LES Liquidity Crisis persisted, LES continued to use new Exchange Funds to meet existing 1031 Exchange obligations in a Ponzi scheme fashion, and the net outflow of LES funds continued. As the Director Defendants could have readily determined as of this meeting, the culmination of this crisis likely would not wait for the October 28th meeting.

115.   On July 30, 2008, LandAmerica filed its Form 10-Q for the quarterly period ended June 30, 2008.  Defendants Chandler and Evans signed fiduciary document.  It stated, among other things:

> Beginning February 2008, the auctions for ARS failed when sell orders exceeded buy orders as a result of liquidity issues in the global credit and capital markets. The portfolio of ARS is comprised entirely of student loan ARS of which 99.1% is guaranteed by government-sponsored enterprises. We believe the failures of these auctions do not affect the value of the collateral underlying the ARS.
>
> However, we have liquidity exposure to these securities to the extent that we would be required to utilize these securities to satisfy the purchase of properties.
>
> In the unlikely event we may need to provide liquidity to the like-kind exchange funds, we may purchase a portion of the ARS for our investment portfolio. Depending on the fair value of the ARS at the time of purchase, we may incur an impairment charge. As of June 30, 2008, we estimate that the ARS were valued at discounts up to 25% of par value based on discounted cash flow models and other available information.
>
> Based on the amount of funds we have historically held, we believe the risk of loss will not have a material adverse effect on our financial position.

See LandAmerica Quarterly Report Form 10-Q, July 30, 2008 at 19-20.

116.   On August 18, 2008, the Risk Committee met.  There was no discussion of the LES Liquidity Crisis.

117.   On information and belief, a meeting of the Risk Committee was scheduled for September 22, 2008 and was cancelled.

118.   A special meeting of the LandAmerica Board of Directors was held on September 26, 2008. After more than seven months of inattention to the issue, the LES Liquidity Crisis had metastasized to the point where LandAmerica's survival was now in question.  The

percentage of the commingled LES portfolio made up of illiquid ARS had grown to over 80%. With LandAmerica's viability as an independent company now very much in doubt, the purpose of the meeting was to discuss the initial steps to pursue a potential sale of LandAmerica to the Markel Corporation. Among other things, the minutes of that meeting record the following:

> "Mr. Chandler reviewed with the Board new developments adversely impacting the Company's financial condition. First, due to the Company's current below book-value stock price, the Company is facing a potential write down of up to $170 million in goodwill in the third quarter, 2008 . . . . Second, as management has publicly disclosed and discussed with the Board, the Company's 1031 Exchange portfolio contains $300 million in illiquid auction rate securities ("ARS").
>
> Because commercial transactions have virtually ceased, the net cash outflow from the 1031 portfolio in the last two months has averaged $100 million per month. The Company will soon have to fund from liquid assets outflows from the 1031 portfolio and, due to market-to-market accounting rules, write down the ARS by up to $60 million, or 20% of their value. "
>
> *   *   *
>
> "The Company is quickly approaching a zone where external circumstances may take matters out of the Board's control."

119.    At this meeting the Director Defendants created a Special Committee of the Board (the "Special Committee") to explore transaction opportunities, "including a potential acquisition of [LandAmerica]." Defendant Chandler recommended that the Special Committee retain J.P. Morgan Securities, Inc. ("J.P. Morgan") and the law firm Wachtell, Lipton, Rosen & Katz to advise it in its efforts.

120.    The LES Liquidity Crisis that supposedly did not "pose a concern" in April 2008 and in July could wait until late October for any meaningful analysis by the LandAmerica Board of Directors was viewed by late September as a primary reason why LandAmerica likely would no longer remain an independent company. Yet, even though the LES Liquidity Crisis had

evolved to this crisis point, the members of the Director Defendants continued to fail to exercise independent judgment and to inform themselves about the legal risks of LES using new Exchange Funds to meet existing 1031 Exchange obligations in a Ponzi like scheme. The Director Defendants did not inform themselves as to whether LES had made, or should make, any changes to its business in light of the LES Liquidity Crisis, such as segregating all new Exchange Funds and/or revising marketing materials or other disclosures to Exchangers. They also did not seek to inform themselves as to whether there likely would be sufficient Exchange Funds to pay out existing 1031 Exchange obligations in the weeks and months ahead. They also did not inform themselves about the extent of LandAmerica's legal liability in connection with LES's 1031 Exchange obligations. They did not implement any oversight process for keeping themselves informed on a regular or ongoing basis about LES's liquidity, and they still did not seek to inform themselves about whether there were viable causes of action against the financial institutions that sold the ARS to LES.

121.    At all relevant times, the Company's "Authority Guidelines" required a prior review and consent by the LandAmerica Board of Directors or its Executive Committee for, among other things:  (a) any capital or general operating expenditure exceeding $10 million; (b) any loan exceeding $10 million; or (c) any other material contract or obligation which is not in the ordinary course of business and which provides for a monetary commitment exceeding $10 million.  Additionally, prior review and consent by the Chairman of the LandAmerica Board of Directors, the Chief Executive Officer of LandAmerica and the Chief Financial Officer of LandAmerica was required for, among other things: (a) any capital or general operating expenditure above $5 million, but not exceeding $10 million; (b) any loan above $5 million but not exceeding $10 million; and (c) any other material contract or obligation which is not in the

ordinary course of business and which provides for a monetary commitment above $5 million but not exceeding $10 million.

122.     From September 25, 2008 through October 17, 2008, Defendant Evans caused LandAmerica to transfer a total of $65 million to LES in an ultimately unsuccessful attempt to plug LES's liquidity hole (the "$65 Million Transfer") caused by the ARS Freeze that began in February 2008.

123.     The $65 Million Transfer was composed of the following transactions: (i) a $35 million transfer from LandAmerica to LES, dated September 25, 2008; (ii) a $15 million transfer from LES to LandAmerica, dated September 30, 2008; (iii) a $10 million transfer from LandAmerica to LES, dated October 8, 2008; (iv) a $10 million transfer from LandAmerica to LES, dated October 14, 2008; (v) a $15 million transfer from LandAmerica to LES, dated October 17, 2008; and (vi) a $10 million transfer from LandAmerica to LES, dated October 17, 2008.

124.     None of these transfers were approved as required by the Company's "Authority Guidelines." Specifically, not one of the transfers exceeding $10 million received the required LandAmerica Board approval and not one of the transfers in the amount of $10 million received the required approval from both Defendants Chandler and Evans.

125.     On the day of the last of the transfers, October 17, 2008, LandAmerica and LES Treasurer Ramos sent the following e-mail to LandAmerica Chief Legal Officer Gluck, Defendants Evans and Chandler:

> "As mentioned to Bill and Michelle early this evening, I made the decision to move $25 million from LFG holdco to LandAmerica Exchange late this afternoon in anticipation of meeting 1031 Exchange disbursement requests we received totaling approximately $22 million for early next week (2 of the largest remaining deals on the books are closing). This brings the total

amount transferred from LFG to the Exchange Company to $55 million. I decided to transfer the money to the Exchange Company this afternoon given the recent dialogue surrounding the criticality that we continue to meet our customer's demands for money in a timely manner."

\*     \*     \*

"At close of business today, following the activity outlined above, LandAmerica holdco has about $17 million on hand. The Exchange Company has about $30 million in cash on hand, a $10 million par value bond (worth about $9 million) and the $290.5 million in ARS. With the decision not to open any more commingled accounts and the large disbursements early next week, I suspect we have a week, two at most, before the Exchange Company runs out of cash if we make all remaining holdco cash available. "

126.   Defendants Evans and Chandler failed to comply with the Authority Guidelines at or about the time of the above-referenced e-mail and at or about the time of any of the transfers set forth above.

127.   On information and belief, the $65 Million Transfer was funded in part by a net $40 million dividend paid to LandAmerica by Commonwealth Land Title Insurance Company ("CLTIC"), LandAmerica's principal title underwriting subsidiary, on September 5, 2008.

128.   Defendants were on notice of the transfers that made up the $65 Million Transfer, but nevertheless failed to deliberate about and vote on the transfers as required by the "Authority Guidelines."

129.   Despite being aware of the transfers making up the $65 Million Transfer, the Director Defendants exercised no independent judgment. The Director Defendants did nothing to inform themselves as to whether such transfers were in the best interest of LandAmerica (*i.e.*, whether the transfers would rectify LES's liquidity problem or merely serve to buy a short delay before LES's inevitable collapse) or Plan participants (who might see their retirement funds

become worthless); or enforce the "Authority Guidelines."

130.    On October 16, 2008, Defendants Chandler and Evans met in Atlanta with SunTrust, one of LandAmerica's primary lenders, to discuss LandAmerica's third quarter results and the impact of these results on certain loan covenants in LandAmerica's Credit Agreement with SunTrust.

131.    During the meeting, Brian Edwards, an attorney with SunTrust, stated that his institution was wary of entering into any further transactions with LandAmerica because LES's Ponzi-type practice of using Exchange Funds to pay existing 1031 Exchange obligations, at a time when much of its assets were illiquid, might be viewed as fraudulent.  Remarkably, this was the first time that it occurred to these LandAmerica officers that this practice raised significant legal issues.

132.    The next day, a decision was made by Defendants Chandler and/or Evans that LES should not take in any more Exchange Funds unless such funds were segregated, that is, not used to meet 1031 Exchange obligations of other Exchangers.  Accordingly, that same day, Mr. Gluck communicated this directive to Mr. Ramos (the "Segregated Funds Directive").  As set forth above, and in response to the Segregated Funds Directive, Mr. Ramos transferred a total of $25 million from LandAmerica to LES to meet near-term LES Exchange obligations.

133.    On this same day, October 17, 2008, a memorandum was sent to the Risk Committee (the "October 17 Memorandum") that identified for the very first time the LES Liquidity Crisis as a "new strategic risk" on its proposed "Risk Dashboard" as of September 30, 2008.  The Risk Dashboard indicated that a response to this risk was yet to be determined and that the responses remained "under development."  According to the October 17 Memorandum, this "new strategic risk" was added to the proposed "Risk Dashboard" based on discussions with

Chief Legal Officer Gluck and was to be presented at the scheduled October 20th Risk Committee meeting. That meeting was cancelled on October 19th. On information and belief, the Risk Committee held no meetings after August 18, 2008.

134.     On Saturday, October 18th, Defendant Evans telephoned Mr. Connor, Senior Vice President of LandAmerica and LES. Defendant Chandler later joined the call. On the call, Mr. Connor was questioned about a decrease of funds in LES's commingled bank account. One or more of the officers on the phone were unaware that, at Mr. Connor's initiative, in anticipation of a change in an IRS regulation, 468(B), LES had recently begun to segregate all new Exchange Funds in excess of two million dollars (the "468(B) Policy Change").

135.     On the October 18th call, or within a day or two thereafter, Mr. Connor was instructed by either Defendant Chandler, Mr. Gluck and/or Mr. Ramos to reverse the 468(B) Policy Change.

136.     Mr. Connor became aware of the extent of the LES Liquidity Crisis for the first time on the October 18th call, eight months after the ARS Freeze occurred.

137.     On Monday, October 18, 2008, Defendant Chandler and/or Mr. Gluck reversed the Segregated Funds Directive issued only one business day prior. The Segregated Funds Directive and the 468(B) Policy Change both were reversed because Defendants Chandler and Evans concluded that LES could not continue to operate unless it continued the Ponzi-type practice of using new Exchange Funds to meet 1031 Exchange obligations to existing Exchangers.

138.     On October 20, 2008, Defendant Chandler wrote to the United States Treasury Secretary, the Honorable Henry M. Paulson, Jr., requesting financial assistance for LandAmerica under the Emergency Economic Stabilization Act of 2008. In this letter, Defendant Chandler in

dramatic terms articulated that the long-festering LES Liquidity Crisis was catastrophic for LandAmerica as a whole:

> "If LandAmerica cannot immediately translate its auction rate securities into the cash necessary to fund such 1031 real estate transactions, hundreds of innocent businesses and individuals will be needlessly harmed, hundreds of scheduled real estate closings will not occur, and there will be a further erosion of public confidence in local real estate deals that are critical to re-building the American economy. Moreover, the ultimate result of LandAmerica's present inability to sell auction rate securities in its portfolio could be a disastrous chain reaction that would cause customers to cease doing business with it and its state regulated insurers."

139.    In late October 2008, LandAmerica facilitated the transfer of $40.1 million in liquid and marketable securities from Lawyers Title Insurance Corporation ("LTIC") LTIC, an underwriting subsidiary, and CLTIC to LES in exchange for illiquid ARS having a par value equal to $55.6 million (the "October ARS Swap").

140.    In November 2008 an additional approximately $29.9 million in liquid and marketable securities were transferred from CLTIC and LTIC to LES in exchange for illiquid ARS having a par value equal to $33.2 million (the "November ARS Swap," together with the October ARS Swap, the "ARS Swaps").

141.    The effect of the ARS Swaps was to diminish the value of the Underwriting Companies by tens of millions of dollars. In that regard, on October 18, 2008, shortly before the October ARS Swap, Peter Kolbe, LandAmerica Senior Vice President and Government Affairs Counsel, transmitted to Mr. Gluck a draft letter resigning as an LandAmerica officer. His draft resignation stated, among other things:

> "For some time now I have expressed grave concerns about pulling assets out of the LFG insurers. I am now forced to opine that not one penny of surplus should come out of those insurers for any reason -- their surplus is too low and it must be preserved to

protect policyholders. I believe this with every ounce of my being. After the financial information I learned today (actually 10/19/08), I am no longer able to argue to any regulator that one penny should come out of the LFG insurers, including the swap of ARS into those insurers. The risk to policyholders is too great. My position exists even if the regulator approves such a swap."

142.    On November 10, 2008, LandAmerica filed its Form 10-Q for the quarterly period

ended September 30, 2008 (the "Third Quarter 10-Q") with the SEC.    This fiduciary

communication was signed by Defendant Chandler and Evans.    The Third Quarter 10-Q reflects

the belated realization that the LES Liquidity Crisis indeed posed disaster for LandAmerica:

". . . . Because 1031 unconditionally obligated for the return and availability of like kind exchange proceeds and related interest in commingled accounts to the taxpayer, our current inability to sell ARS at par value to satisfy these obligations required us for the first time in the third quarter of 2008 to perform under contingent obligation by providing liquidity to the commingled like-kind exchange fund accounts.

During the quarter ended September 30, 2008, we advanced $20.0 million of cash to the like-kind exchange funds. Subsequent to September 30, 2008, we advanced an additional $45 million of cash to the like-kind exchange funds. In order to provide liquidity to the 1031 exchange company going forward, we have or will contribute approximately $88.8 million par value of auction rate securities to our title insurance subsidiaries (with the approval of the Nebraska Department of Insurance) in exchange for liquid assets with an approximate value of $70.0 million. The Nebraska Department of Insurance approved the contribution of an approximately $34.2 million par value of auction rate securities to our title insurance subsidiaries in exchange for liquid assets with an approximate value of $30.0 million upon the expiration of Fidelity's due diligence contingency. In connection with the execution of the merger agreement, a subsidiary of Fidelity also agreed to provide us with a $30.0 million stand-by credit facility for our 1031 exchange company secured by auction rate securities held for the benefit of customers of that subsidiary. The stand-by credit facility cannot be drawn upon until the expiration of Fidelity's due diligence contingency on November 21, 2008.

While we cannot predict the timing or amounts of additional ARS we may need to acquire from the like-kind exchange funds, we

believe that it is probable we will need to make such acquisitions or provide other forms of liquidity to the like-kind exchange funds to satisfy our contingent obligation. As a result, we have recorded at September 30, 2008 a contingent obligation and corresponding estimated loss of $60.5 million, which represents our estimate at September 30, 2008 of the probable loss we will incur to satisfy our contingent obligation to return or make available exchange funds and related interest to taxpayers. We estimated the probable loss based on the shortfall between the estimated fair value and the par value of the ARS held in the like-kind exchange funds at September 30, 2008."

*    *    *

"While significant attention is currently being given to redemptions or other means of restoring liquidity to auction rate securities by the issuers of the securities, the financial markets and federal and state government officials, no assurance can be given as to the timing or amount of redemptions or the return of liquidity for these securities.

Accordingly, our estimate of the liability resulting from our contingent obligation may increase in the near term, and the resulting losses could be significant.

See LandAmerica Quarterly Report (Form 10-Q), dated Nov. 10, 2008 at 29-30.

143.    Defendants had allowed the LES Liquidity Crisis to fester for at least seven months and had failed to timely or adequately inform themselves about a wide array of issues and alternatives that were relevant to nothing short of the continued viability of both LandAmerica and LES. By the fall, the day of reckoning was fast upon them -- they knew that it would only be a matter of weeks or days before LES would run out of funds with which to meet its obligations, and when that day came, they also knew there would be nothing left of LandAmerica's reputation. And as of October 16, Defendants Chandler and Evans finally realized that the legal fallout could be considerable. In short, they had a ticking time bomb on their hands and they needed to hand it off before it was too late. Their inaction led to desperation, which only served to exacerbate the damages that the Plan would ultimately incur.

- 40 -

Accordingly, LandAmerica's efforts to find a buyer took place under extremely distressed circumstances, rather than in an orderly fashion.

144.    On November 7, 2008, LandAmerica executed a merger agreement (the "Prior Merger Agreement") with Fidelity National Title Insurance Company, Chicago Title Insurance Company and Fidelity National Financial, Inc. (collectively, "Fidelity"). Under the Prior Merger Agreement, Fidelity was to acquire LandAmerica as a whole, including all of its assets and associated liabilities. The Prior Merger Agreement provided for a two-week diligence and exclusivity period, from November 7, 2008 until November 21, 2008, during which time LandAmerica was restrained from undertaking any negotiations with other potential suitors. The Prior Merger Agreement provided that Fidelity could terminate the merger transaction if it was not satisfied with what it uncovered during the diligence period (the "Diligence Out").

145.    LandAmerica's officers and directors consented to Fidelity's request for the Diligence Out as a part of the Prior Merger Agreement because of their self-created desperation.

146.    At the close of the diligence and exclusivity period on November 21, 2008, Fidelity notified LandAmerica that it was exercising its right, by virtue of the Diligence Out provision, to terminate the Prior Merger Agreement.

147.    The Prior Merger Agreement was the last alternative to provide a liquidity solution for LES. When it fell through, there were no more.

148.    On November 24, 2008, LES closed its business. In a letter to its customers, LES wrote:

> "Dear Valued Customer"
>
> We regret to inform you that, effective November 24, 2008, LandAmerica 1031 Exchange Services Company, Inc. ("LES") is accepting no new customers and is terminating its operations. Although the total par value of our 1031 Exchange funds exceeds

the value of all funds received from our customers, portions of the 1031 funds are invested in illiquid auction rate securities. Our inability to sell or borrow against these securities has precipitated our decision to terminate operations.

LES has long invested 1031 deposits only in Investment Grade Securities Rated A or stronger, including auction rate securities backed by federally guaranteed student loans. Our goal for the exchange funds has been to maintain the full liquidity necessary to meet customer withdrawal demands. The auction rate securities in our exchange funds, which were sold to us by certain financial institutions, were highly liquid for many years. As has been widely publicized, the auction rate securities market froze earlier this year, and that extenuating circumstance prevents us from liquidating the auction rate securities held in the exchange funds.

We understand that this situation is detrimental to you, and we can only assure you that we have taken every reasonable step possible to avoid the problem, including pursuing numerous liquidity options to no avail. You will be provided soon with details regarding the establishment of a process for submitting claims relating to exchange funds

This situation involves only LES and not any other LandAmerica companies. Specifically, LandAmerica's title insurers are highly regulated companies, with legal identities and assets completely separate from LES. These insurers have more than sufficient assets to meet their obligations to policyholder and escrow customers. "

In summary, LES declared that it shut its doors on account of the ARS Freeze, which began more than nine months earlier, before all of its then-existing Exchangers had become LES customers.

149.    Also on Monday, November 24, 2008, the Nebraska Department of Insurance ("NEDOI"), the insurance regulatory agency governing LTIC and CLTIC, filed a petition with the Court of Lancaster County, Nebraska, to place LTIC and CLTIC in rehabilitation. The petition was sustained. The basis for the petition was NEDOI's finding that LTIC and CLTIC were in "hazardous financial condition." On information and belief, the foregoing condition was caused in substantial part by the $65 Million Transfer, the ARS Swaps, and/or the CLTIC Dividend.

150.    On November 26, 2008, LandAmerica and LES filed voluntary petitions in the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court") for relief under the Bankruptcy Code.

151.    The Affidavit of G. William Evans, Chief Financial Officer of LandAmerica Financial Group, Inc. and Vice President of LandAmerica 1031 Exchange Services, Inc. in Support of Chapter 11 Petition and First Day Pleadings stated, among other things, that "LFG's liquidity has been significantly constrained as a result of difficulties faced by LES."

152.    As of the Petition Date, LES had approximately $46 million of commingled funds (excluding the illiquid ARS) with which to satisfy approximately $191 million of commingled 1031 Exchange obligations.

153.    After Fidelity terminated the Prior Merger Agreement, the Director Defendants scrambled to arrange for an alternative transaction to secure some value for a deteriorated LandAmerica. Accordingly, LandAmerica re-opened negotiations with Fidelity about a potential transaction involving the sale of LandAmerica's stock in the Underwriting Companies.

154.    On November 25, 2008, Fidelity executed the Stock Purchase Agreement (the "SPA") with LandAmerica whereby Fidelity agreed to acquire, among other things, the stock of the Underwriting Companies from LandAmerica in exchange for cash consideration of approximately $298 million.

155.    On December 12, 2008, LandAmerica and Fidelity executed an amended and restated version of the SPA (the "Revised SPA"). The Revised SPA set the total purchase price for the Underwriting Companies' stock at approximately $298 million ($16 million of which was subject to a delayed closing).

156.    On December 17, 2008, the Bankruptcy Court granted Debtor's Motion for Order

Approving Related Stock Purchase Agreement.

157.    On December 17, 2008, Fidelity attempted to withdraw from the sale by claiming, among other things, that a material adverse change had occurred with respect to the Underwriting Companies' businesses. Thereafter, on December 18, 2008, LandAmerica filed an adversary complaint against Fidelity alleging anticipatory repudiation of the Revised SPA and requesting that Fidelity be ordered to specifically perform under the terms of the Revised SPA.

158.    After a hearing on December 21, 2008, the Bankruptcy Court approved a further amended version of the Revised SPA (the "Final SPA"), which was the result of a settlement between LandAmerica and Fidelity. The sale of the Underwriting Companies to Fidelity closed on December 22, 2008.

159.    Pursuant to the terms of the Final SPA, LandAmerica received:    (i) approximately $147 million in cash (which included $59 million transferred to LandAmerica's Cash Balance Plan in accordance with the terms of the Final SPA); (ii) 3,176,620 shares of common stock in Fidelity National Financial, Inc. ("FNF"); and (iii) a subordinated promissory note issued by FNF in an initial principal amount equal to $50 million due in 2013. The proceeds received were far less than the fair (non-distressed) value of the title subsidiaries in December 2008. Further, the value of the Underwriting Companies had by December decreased considerably, due in no small part to the ARS Swaps and the CLTIC Dividend.

160.    Multiple adversary proceedings were filed against LandAmerica and/or LES on account of LES using new Exchange Funds to pay out on existing 1031 Exchange obligations after the ARS Freeze. The LandAmerica and LES bankruptcy estates have been depleted by millions of dollars to defend against or otherwise address these complaints.

161.    Further, the LandAmerica and LES bankruptcy estates have been depleted by

millions of dollars to respond to and address multiple government investigations arising out of the LES Liquidity Crisis.

162. According to testimony by Devon M. Jones, from February 2008 to the February 11, 2009 date of Jones' deposition, the ARS market was frozen and no ARS's were redeemed. *See* February 11, 2009 deposition transcript of Devon M. Jones at p. 126.

## THE LAW UNDER ERISA

163. ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

164. ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

165. ERISA § 404(a)(l)(A) and (B), 29 U.S.C. § 1104(a)(l)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

166.   These fiduciary duties under ERISA § 404(a)(l)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence, and are the "highest known to the law." They entail, among other things:

(a)     the duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan, including in this instance the Plan, which invested in LandAmerica stock, to ensure that each investment is a suitable option for the Plan;

(b)     the duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the Plan's sponsor; and

(c)     a duty to disclose and inform, which encompasses: (i) a negative duty not to misinform; (ii) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (iii) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

167.   ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for breach by cofiduciary," provides, in pertinent part, that ". . . [i]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (1) if he participates knowingly in, or knowingly fails to disclose, an act or omission of such other fiduciary, knowing such act or omission is a breach; (2) if, by his failure to comply with section 404(a)(l), 29 U.S.C. § 1104(a)(l), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to

commit a breach; or (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

168.    Plaintiff therefore brings this action under the authority of ERISA § 502(a)(2) for plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by Defendants for violations under ERISA § 404(a)(l) and ERISA § 405(a).

## DEFENDANTS' FIDUCIARY STATUS

169.    ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." § 402(a)(l), 29 U.S.C. § 1102(a)(l).

170.    During the Relevant Period, all of the Defendants acted as fiduciaries of the Plan pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A) and the law interpreting that section. As outlined herein, Defendants all had discretionary authority and control with respect to the management of the Plan and/or the management or disposition of the Plan's investments and assets, and/or had discretionary authority or responsibility for the administration of the Plan.

171.    During the Relevant Period, upon information and belief, the Company made direct and indirect communications with the Plan's participants including statements regarding investments in Company stock. These communications included, but were not limited to, SEC filings, annual reports, press releases, and Plan documents (including Summary Plan Descriptions ("SPDs") and/or prospectuses regarding Plan participants holdings of Company stock), which included and/or reiterated these statements. Upon information and belief, at all times during the Relevant Period, LandAmerica's SEC filings were incorporated into and part of such SPDs and/or prospectuses. Thus, Defendants also acted as fiduciaries to the extent of their

communications with Plan participants.

172.     In addition, under ERISA, in various circumstances, non-fiduciaries who knowingly participate in fiduciary breaches may themselves be liable. To the extent any of the Defendants are held not to be fiduciaries, they remain liable as non-fiduciaries who knowingly participated in the breaches of fiduciary duty described below.

## CAUSATION

173.     Upon information and belief, the Plan suffered millions of dollars in losses in plan benefits because substantial assets of the Plan were imprudently invested or allowed to be invested by Defendants in LandAmerica stock during the Relevant Period, in breach of Defendants' fiduciary duties.

174.     Had Defendants properly discharged their fiduciary and/or co-fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in LandAmerica stock, eliminating such Company stock as an investment alternative when it became imprudent, and divesting the Plan from its holdings of LandAmerica stock when maintaining such an investment became imprudent, the Plan would have avoided a substantial portion of the losses that it suffered.

175.     Also, reliance is presumed in an ERISA breach of fiduciary duty case.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

176.     Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plan's assets should not have been invested in LandAmerica stock during the Relevant Period. As a consequence of Defendants' breaches, the Plan suffered significant losses.

177.   ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary. . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . . ."

178.   With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the Plan would not have made or maintained their investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available. In this way, the remedy restores the values of the Plan's assets to what they would have been if the Plan had been, properly administered.

179.   Plaintiff and the Plan are therefore entitled to relief from Defendants in the form of: (a) a monetary payment to the Plan to make good to the Plan and the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2-3), 29 U.S.C. §§ 1109(a) and 1132(a)(2-3); (c) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (d) taxable costs; (e) interest on these amounts, as provided by law; and (f) such other legal or equitable relief as may be just and proper.

180.   Under ERISA, each defendant is jointly and severally liable for the losses suffered by the Plan in this case.

## CAUSES OF ACTION

### FIRST CLAIM: INVESTMENT IN LANDAMERICA STOCK
### (AGAINST ALL DEFENDANTS)

181. Plaintiff realleges and incorporates herein by reference the allegations set forth above.

182. Pursuant to ERISA § 409(a), 29 U.S.C. § 110(a), any fiduciary who breaches any of the responsibilities, obligations or duties imposed by ERISA § 404 shall be personally liable to make good to a plan any losses to that plan resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

183. Pursuant to ERISA § 404, Defendants had a duty to discharge their duties with respect to the Plan solely in the interests of the participants and for the exclusive purpose of providing benefits to the participants. Defendants' selection, monitoring, and continuation of the investment alternatives under the Plan were subject to the above-described fiduciary duties. By their continuing to invest in LandAmerica stock under the Plan, when LandAmerica's true adverse financial and operating condition was being concealed, Defendants breached each of these fiduciary duties.

184. As a consequence of Defendants' breaches, the Plan suffered losses.

185. Defendants are individually liable to make good to the Plan any losses to the Plan resulting from each breach.

186. Pursuant to ERISA § 502(a)(3), 11 U.S.C. § 1132(a)(3), the Court should also award appropriate equitable relief, including in the form of restitution.

### SECOND CLAIM: MISREPRESENTATION AND NONDISCLOSURE
### (AGAINST ALL DEFENDANTS)

187. Plaintiff realleges and incorporates herein by reference the allegations set forth above.

188.   Pursuant to ERISA § 409(a), 29 U.S.C. § 110(a), any fiduciary who breaches any of the responsibilities, obligations or duties imposed by ERISA § 404 shall be personally liable to make good to a plan any losses to that plan resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

189.   Pursuant to ERISA § 404, Defendants had a duty to discharge their duties with respect to the Plan solely in the interests of participants and for the exclusive purpose of providing benefits to the participants.

190.   Defendants breached these fiduciaries in that they made material misrepresentations and nondisclosures as alleged above.

191.   As a consequence of Defendants' material misrepresentations and misleading omissions, the Plan suffered losses.

192.   Defendants are individually liable to make good to the Plan any losses to the Plan resulting from each breach.

193.   Pursuant to ERISA § 502(a)(3), 11 U.S.C. § 1132(a)(3), the Court should also award appropriate equitable relief, including in the form of restitution.

### THIRD CLAIM: DIVIDED LOYALTY
### (AGAINST ALL DEFENDANTS)

194.   Plaintiff realleges and incorporates herein by reference the allegations set forth above.

195.   Pursuant to ERISA § 409(a), 29 U.S.C. § 110(a), any fiduciary who breaches any of the responsibilities, obligations or duties imposed by ERISA § 404 shall be personally liable to make good to a plan any losses to that plan resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

196.    Pursuant to ERISA § 404, Defendants had a duty to discharge their duties with respect to the Plan solely in the interests of the participants and for the exclusive purpose of providing benefits to the participants.

197.    Defendants breached their fiduciary obligations when they acted in their own interests rather than solely in the interests of the participants and beneficiaries.

198.    As a consequence of these breaches, the Plan suffered losses.

199.    Defendants are individually liable to make good to the Plan any losses resulting from each breach.

200.    Pursuant to ERISA § 502(a)(3), 11 U.S.C. § 1132(a)(3), the Court should also award appropriate equitable relief, including in the form of restitution.

### FOURTH CLAIM:  MISMANAGEMENT OF PLAN ASSETS
### (AGAINST ALL DEFENDANTS)

201.    Plaintiff realleges and incorporates herein by reference the allegations set forth above.

202.    Pursuant to ERISA § 409(a), 29 U.S.C. § 110(a), any fiduciary who breaches any of the responsibilities, obligations or duties imposed by ERISA § 404 shall be personally liable to make good to a plan any losses to that plan resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

203.    Pursuant to ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), Defendants were required to discharge their duties with respect to the Plan solely in the interests of the participants with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and of like aims, and to diversify investments in the Plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so.

204.    Defendants breached these duties in that the Plan invested in LandAmerica stock when the price of LandAmerica stock was artificially inflated and when LandAmerica stock was not a prudent retirement investment, thereby failing to diversify assets so as to minimize the risk of large losses.

205.    As a consequence of these breaches, the Plan suffered losses.

206.    Defendants are individually liable to make good to the Plan any losses resulting from each breach.

207.    Pursuant to ERISA § 502(a)(3), 11 U.S.C. § 1132(a)(3), the Court should also award appropriate equitable relief, including in the form of restitution.

**FIFTH CLAIM: BREACH OF THE DUTY TO PROPERLY APPOINT, MONITOR AND INFORM THE BENEFITS COMMITTEE AND MEMBERS OF THE BENEFITS COMMITTEE (AGAINST THE MONITORING DEFENDANTS ONLY)**

208.    Plaintiff realleges and incorporates herein by reference the allegations set forth above.

209.    Director Defendants (the "Monitoring Defendants") had the duty and responsibility to properly appoint, monitor and inform the members of the Benefits Committee and/or other persons who exercised day-to-day responsibility for the management and administration of the Plan and its assets.

210.    The Monitoring Defendants failed to properly appoint, monitor and inform such persons in that the Monitoring Defendants failed to adequately inform such persons about the true financial and operating condition of the Company or, alternatively, the Monitoring Defendants did adequately inform such persons of the true financial and operating condition of the Company (including the financial and operating problems being experienced by LandAmerica during the Relevant Period identified herein) but nonetheless continued to allow such persons to offer LandAmerica stock as an investment option under the Plan even though the

market price of LandAmerica stock was artificially inflated and even though LandAmerica stock was not a prudent investment for participants' retirement accounts under the Plan.

211.    As a consequence of these breaches, the Plan suffered losses.

212.    The Monitoring Defendants are individually liable to make good to the Plan any losses resulting from each breach.

213.    Pursuant to ERISA § 502(a)(3), 11 U.S.C. § 1132(a)(3), the Court should also award appropriate equitable relief, including in the form of restitution.

## PRAYER FOR RELIEF

**WHEREFOR**, Plaintiff prays for:

A       Declaration that Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.      An Order compelling Defendants to make good to the Plan all losses resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits Defendants made through use of the Plan's assets, and to restore to them all profits which the participants would have made if Defendants had fulfilled their fiduciary obligations;

C.      Imposition of a Constructive Trust on any amounts by which any Defendants was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

D.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses

E.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

F.      An Order for equitable restitution and other appropriate equitable and injunctive relief against Defendants.

Dated: March 20, 2014          Respectfully submitted,

**CUNEO GILBERT & LaDUCA, LLP**

By:_____
Daniel M. Cohen (VSB No. 79836)
211 North Union Street, Suite 100
Alexandria, VA 22314
(202)789-3960 (telephone)
(202)789-1813 (facsimile)
danielc@cuneolaw.com

Thomas J. McKenna
Gregory M. Egleston
**GAINEY McKENNA & EGLESTON**
440 Park Avenue South, 5th Floor
New York, NY 10016
Tel: (212) 983-1300
Fax: (212) 983-0380
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

*Attorneys for Plaintiff*

- 55 -